IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03014-MEH

JENNIFER FOCKE,

     Plaintiff,

v.

IRENE CONANT ALLEN,

     Defendant.

_____

**ORDER**
_____

     Plaintiff claims that Defendant forged Mr. Miller's signature on a form to remove her as a beneficiary to his life insurance policy. The parties tried this action to the Court on May 24 and 25, 2021. Based on the evidence admitted at trial, the legal briefing, and pursuant to Fed. R. Civ. P. 52, the Court issues these Findings of Facts and Conclusions of Law. The Court rules in Defendant's favor and against Plaintiff on both claims for relief.

## **FINDINGS OF FACT**

     1.    Randall Miller was married to Phyllis Bargren. ECF 69 at 22-23. They had two children during their marriage: Plaintiff and Christopher Miller. *Id*. at 20; ECF 70 at 167-68. They divorced in 1988. ECF 69 at 27.

     2.    Regarding the relationship between Mr. Miller and his daughter, the Plaintiff, it suffices to say that it was strained, often without much direct contact, but a relationship that continued nonetheless. They had spoken on the phone a few weeks before he passed. *Id*. at 50.

     3.    Plaintiff currently lives in Texas, where she grew up. *Id*. at 20.

     4.    Defendant met Mr. Miller in the mid-1990's when they both lived in Texas. *Id*. at

236, 340; ECF 70 at 6, 28. They began dating at that time (*id*. at 341), and in 1999, they entered into a committed, monogamous relationship (*id*. at 236). Defendant considered themselves married in the sense of a private, personal commitment to each other, and others likewise perceived them to be in a relationship. *Id*. at 277-78; ECF 70 at 161, 197. However, they never entered a formal, legal marriage. Although they held themselves out as married, Defendant reported her marital status as single in certain legal proceedings and contexts. ECF 69 at 276-80, 308.

5.      Defendant's relationship with Mr. Miller similarly was volatile. *Id*. at 236, 341; ECF 70 at 6, 29, 199. It appears they did not live together and at one point had separated. Defendant regarded their marriage as ongoing nonetheless, and by time of the beneficiary change, they had reconciled. ECF 69 at 51, 238, 274, 276, 283-87; ECF 70 at 200.

6.      In 1996, Mr. Miller had executed a will and named Defendant as its executor. ECF 69 at 38; Pl. Ex. 16.

7.      The relationship between Mr. Miller's daughter (the Plaintiff) and his significant other (the Defendant) always was difficult. ECF 69 at 51.

8.      The evidence shows that Mr. Miller was a temperamental person with a mean side. He was that way with everyone equally, including both Plaintiff and Defendant. Insobriety played a role. However, he also had a caring side, and he valued being a good provider. *Id*. at 51, 54, 59, 236, 322, 342-43; ECF 70 at 27, 29-30.

9.      Defendant is a businesswoman who oversaw several small businesses and property investments, to which Mr. Miller contributed financially. ECF 69 at 51, 67-68, 244-45, 291, 293-99, 303-07.

10.     Eventually, both Mr. Miller and Defendant moved to Colorado. In 2012, Mr. Miller sold his house in Texas (*id*. at 121), and began living in the town of Howard, Colorado (*id*. at 63,

92, 100, 238, 306).

11.     Mr. Miller gave Defendant title to certain real property and money from various sources including from the sale of his Austin home and an early disbursement from the subject life insurance policy. Mr. Miller gave the Howard, Colorado residence to her. *Id*. at 95, 289-90, 312-13.

12.     The 2013 version of the will (Pl. Ex. 24) was Mr. Miller's final will and testament that was probated after his passing.

13.     Mr. Miller had purchased a life insurance policy from the Aurora Life Insurance Co. that is not in dispute. That policy paid Plaintiff and Defendant each $225,000. ECF 69 at 56, 94, 120.

14.     The life insurance policy subject of this lawsuit was sold by Jackson National Life Insurance Co. Initially, Mr. Miller had included Plaintiff as a co-beneficiary. *Id*. at 57.

15.     Mr. Miller sent money to his grandsons (Plaintiff's sons) on Easter 2017. When he did not receive a "thank you" in return, he called Plaintiff and left angry voicemail messages. In practical effect, he told Plaintiff that he was disinheriting her. *Id*. at 117-19.

16.     On October 19, 2016, Mr. Miller called Jackson National Life Insurance Co. to request a change of policy beneficiaries. During that call, Mr. Miller learned that under the policy's terms, Defendant must be the sole beneficiary to receive an additional spousal benefit. *Id*. at 9, 317; Def. Ex. J.

17.     Mr. Miller instructed Jackson National Life Insurance Co. to send the required change of beneficiary form to Defendant and himself. ECF 69 at 11-14; Def. Ex. B-15; Def. Ex. K. The executed version of that form (Pl. Ex. 54) made Defendant the sole primary beneficiary of the policy. Before that change, Plaintiff and Defendant both had a fifty percent share of the policy

benefit, which at the time of Mr. Miller's passing was worth $502,101.46. ECF 69 at 242-43; ECF 27-4; Def. Ex. B-11 at 93.

18.     At Mr. Miller's request, Defendant filled it out on October 19, 2016. At the time, she was in Colorado Springs. ECF 69 at 240-41, 244, 246; ECF 70 at 185.

19.     On October 21, 2016, Defendant drove to Mr. Miller's residence in Howard to bring him the form. ECF 69 at 240-41, 244, 254. When she arrived, Mr. Miller was outside working in the yard. He was sitting in a lawn chair and using a pressure washer to dig a trench for a propane line to connect the main propane tank to his outdoor grill. *Id*. at 244, 246-48.

20.     While he sat in the lawn chair with the pressure washer hose across his lap, Mr. Miller asked for the form and a pen. *Id*. at 249, 260.

21.     The change of beneficiary form bears either what actually is or what purports to be Mr. Miller's signature along with his phone number (pre-typed) and either actually what is or what purports to be his own writing of his initials "RAM" next to the change of date from "10/19/2016" (pre-typed) to the overwritten "10/21/2016." Pl. Ex. 54 at 3.

22.     Mr. Miller was competent at the time when Defendant presented him with the change of beneficiary form. ECF 69 at 16.

23.     Defendant took several photographs of Mr. Miller with the form in his lap and with a pen in his hand. Def. Ex. M-U. In addition to the reproduced photos submitted into the record, the Court examined in the courtroom the digital originals that remained in Defendant's iPhone. ECF 69 at 267-71. They were entered into the record as Def. Ex. B-16.

24.     None of the photos show the form's signature block as blank. Some of the photos show what appears to be the original, first signature. Other photos show what appears to be writing over (to retrace or touch up) part of the already existing signature. ECF 69 at 127, 163-64, 183-84,

218, 225-26, 255. All of the photos show Mr. Miller affixing the pen to the form's signature block at various points along the signature. ECF 70 at 172-73. He is holding the pen with his left hand (he is left-handed); holding the form over a manila file folder with his right hand; and using the power washer hose across his lap as the writing surface. ECF 69 at 181-82; ECF 70 at 114, 170. In those photos, Mr. Miller either is looking down at the form or is smiling directly into the camera. There is no dispute over the authenticity of the photographs, what they show, and that Defendant took them with her iPhone's camera. ECF 69 at 227, 265; ECF 70 at 171. Defendant testified that she took them at Mr. Miller's request (ECF 69 at 255, 257-59) and that he was sober that day (ECF 70 at 171).

25.     Mr. Miller passed away on June 5, 2017. ECF 69 at 118. He had fallen down the stairs. ECF 70 at 33, 157. A tenant living in the house found him. ECF 69 at 97; ECF 70 at 157. He was seventy years old. ECF 27-1 at ¶ 6.

26.     On June 7, 2017, Plaintiff first called Jackson National Life Insurance Co. to inquire about the policy benefit. Contrary to her expectation, she learned that she was not a beneficiary. Def. Ex. A-6; Def. Ex. B-10 at 42; ECF 69 at 103-06.

27.     Plaintiff called the insurance company again on June 29, 2017. She expressed shock over the fact that she no longer was a beneficiary but Defendant was. She told the claims representative that something appeared to be wrong. If Plaintiff wanted a copy of the change of beneficiary form, the representative advised her to request it from the executor of Mr. Miller's estate or obtain a court order. Plaintiff stated that she would pursue a court order. Def. Ex. A-12; Def. Ex. B-10 at 37; ECF 69 at 108-111.

28.     In June 2017, Defendant initiated the probate case of Mr. Miller's estate as its personal representative. ECF 27-1 at ¶ 43.

29.    In July 2017, Defendant claimed the full policy benefit. ECF 27-1 at ¶ 49; ECF 27-5.

30.    On January 2, 2018, Plaintiff asked the probate court to remove Defendant as the estate's personal representative upon her objection to "cross business interests" between Defendant and Mr. Miller. ECF 69 at 67; ECF 27-1 at ¶ 44. On July 2, 2018, Defendant voluntarily resigned as the personal representative. ECF 27-1 at ¶ 45.

31.    On October 9, 2018, the estate's new personal representative gave Plaintiff a copy of the change of beneficiary form. ECF 69 at 69-70. When Plaintiff saw the signature on it, she suspected a forgery. *Id*. at 71.

32.    From Mr. Miller's probated will, Plaintiff received $80,000 (*id*. at 55), and Defendant received nearly $200,000 (*id*. at 56).

33.    Plaintiff filed this lawsuit on October 6, 2020. ECF 1.

34.    Both sides retained expert witnesses to opine about whether Mr. Miller made the original signature on the change of beneficiary form. Defendant agreed to let Plaintiff call one of her three expert witnesses (Jan Kelly) to testify and to stipulate to the testimony of the other two. ECF 69 at 129-30. Ms. Kelly is a forensic document examiner (*id*. at 132), and she wrote a report regarding her investigation (Pl. Ex. 56). Ms. Kelly opined that Mr. Miller "probably did not write" the signature on the form and "may have not" written the "RAM" initials. ECF 69 at 149. Also introduced into evidence was the report by Linda James (Pl. Ex. 57) and Laurie Hoeltzel (Pl. Ex. 58). According to Ms. James, it was highly probable that the person who had written the questioned signature (on the change of beneficiary form) was not Mr. Miller (the writer of the known reference signatures). ECF 70 at 146.

35.    Defendant retained Richard Lewis, a forensic document examiner, as her expert

witness, who likewise authored a report (Pl. Ex. 60). Mr. Lewis was unable to reach an opinion, one way or the other, whether Mr. Miller wrote the signature on the form. His conclusion was inconclusive in other words. ECF 69 at 187-88; ECF 70 at 108-09, 143.

36.     All of the experts used the same scale for measuring the likelihood that the person who had written the "known" signatures, also wrote the "questioned" signature. In the middle of that spectrum is the entirely inconclusive or uncertain determination. That was where Defendant's expert, Mr. Lewis, landed. The further to the right one moves along the scale, the *more* probable it is that the same person wrote the signature, with the endpoint being a fully positive "identification." The progressive degrees of likelihood toward that endpoint are rated as "may have," "probably," "highly probable," and "definitively" wrote the signature. The further to the left one moves in the opposite direction from the center point, the *less* probable it is that the same person wrote the signature (and thus more likely the questioned signature is a forgery). This side of the scale is the mirror image, moving from "may not have," "probably did not," "highly probable did not," and ending with the elimination of the person as the signature's writer. ECF 69 at 189-90.

37.     All of Plaintiff's experts—Kelly, James, and Hoeltzel—opined with various levels of certainty that Mr. Miller did *not* sign the change of beneficiary form. Defendant's expert—Lewis—opined that it was inconclusive whether Mr. Miller signed it. In other words, none of the parties' expert witnesses saw any positive likelihood that Mr. Miller *did* sign it.

## ANALYSIS

### I.     Plaintiff's Claims for Relief

Plaintiff seeks relief under the theories of civil theft and conversion. The burden of proof for both is by the preponderance of the evidence. *Itin v. Ungar*, 17 P.3d 129, 135, n.9 (civil theft);

*Black v. Black*, 422 P.3d 592, 607 (Colo. App. 2018) (civil theft); *Atlas Biologicals, Inc. v. Kutrubes*, No. 15-cv-00355-CMA-KMT, 2019 WL 4594274, at *18 (D. Colo. Sep. 23, 2019) (both civil theft and conversion).

### A.   Civil Theft

Colorado law permits a victim to bring a theft allegation as a civil action. Colo. Rev. Stat. § 18-4-405. *See also Itin*, 17 P.3d at 133; *Black*, 422 P.3d at 606. To prevail on her theft claim, Plaintiff must prove: (1) Defendant knowingly obtained, retained, or exercised control over something of value, (2) that belonged to Plaintiff, (3) without authorization, by threat, or by deception, and (4) intentionally and knowingly to permanently deprive her of it. Colo. Rev. Stat. § 18-4-401; *Van Rees v. Unleaded Software, Inc*., 373 P.3d 603, 608 (Colo. 2016); *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1179 (D. Colo. 2019). The cause of action includes the theft of money. *Itin*, 17 P.3d at 131.

A theft victim may recover three times the amount of the actual damages caused by the theft. Also recoverable are the attorney fees and costs. Colo. Rev. Stat. § 18-4-405.

Plaintiff alleges lack of authorization or deception in the form of forgery that divested her of the insurance policy's full benefit.

### B.   Conversion

Common law conversion is any distinct, unauthorized act of dominion or ownership exercised by one person over another's personal property. *Itin*, 17 P.3d at 135, n.10. The interference must be intentional and substantial. Colo. Pattern Civil Jury Instruction ("CJI-Civ.") 32:2. The law recognizes a variety of ways in which a defendant unlawfully interferes with a plaintiff's property. A defendant may take physical possession of the property, prevent the plaintiff from accessing it, or possess the property in a way that exceeds the extent and duration of

authorized use. CJI–Civ. 32:1(2). Unlike the civil theft cause of action, conversion does not require a showing of specific intent. *Itin*, 17 P.3d at 135, n.10.

A plaintiff also may need to prove that the defendant refused to return the property despite a demand to do so. *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984); *DTC Energy*, 420 F. Supp. 3d at 1181. However, that particular requirement possibly may apply only in the situation when a defendant came into lawful possession of the property, but was unable to return it or did not know of the plaintiff's superior ownership claim. *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987); *Schmidt v. Cowen Transfer & Storage Co.*, 463 P.2d 445, 447 (Colo. 1970); *Fin. Corp. v. King*, 370 P.2d 432 (Colo. 1962); *Davis v. Am. Nat'l Bank of Denver*, 367 P.2d 325, 326 (Colo. 1961).

Plaintiff's conversion claim likewise rests on the allegation that Defendant wrongfully wrote Mr. Miller's signature on the change of beneficiary form.

## II.     No Statute of Limitations Bar

A plaintiff has two years to bring either a civil theft or conversion claim. *Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1168 (D. Colo. 2016) (citing Colo. Rev. Stat. § 13-80-102). Defendant argues that Plaintiff filed this lawsuit after that two-year period of time.

The statute of limitations began to run when the claims accrued. Accrual happens on the day when both the injury and its cause became known or should have been knowable to Plaintiff by the exercise of reasonable diligence. Colo. Rev. Stat. § 13-80-108. In other words, it is the point when a plaintiff knows (or should have known) all material facts essential to show the elements of the cause of action. The focus of the inquiry is on the discovery of facts, not the realization of potential causes of action. *Crosby v. Am. Family Mut. Ins. Co.*, 251 P.3d 1279, 1285-87 (Colo. App. 2010). Moreover, a plaintiff must have exercised reasonable diligence to discover the

relevant facts or circumstances. "Reasonable diligence" is determined objectively and does not reward denial or self-induced ignorance. *Murry v. Guideone Specialty Mut. Ins. Co*., 194 P.3d 489, 492 (Colo. App. 2008) (citing *Sulca v. Allstate Ins. Co*., 77 P.3d 897, 900 (Colo. App. 2003)). It is Defendant's burden to prove when the claims accrued. *Crosby*, 251 P.3d at 1283.

Defendant argues that Plaintiff "knew no later than June 29, 2017 that [Defendant] had at least a claimed right to funds that [Plaintiff] claims to have been hers." ECF 76-1 at 17. On that day, Plaintiff called Jackson National Life Insurance Co. to discuss her perception that something was amiss. Indeed, Plaintiff knew as early as June 7, 2017 (two days after her father's passing) that she was not a beneficiary to the policy as expected. However, all that she knew at this point was that she no longer was a policy beneficiary. In other words, Plaintiff only knew of her loss of that property interest, and thus only that element of the claims. While it may have been a source of concern, she had no reason to suspect the wrongdoing that had caused the deprivation or by whom.

It was not until she saw a copy of the change of beneficiary form on October 9, 2018 when she had enough information to suspect an act of wrongdoing, *i.e*, in the form of forgery. *Stjernholm v. Life Ins. Co. of N. Am*., 782 P.2d 810, 811 (Colo. App. 1989) (finding that the conversion claim accrued when plaintiff discovered the forgeries). It was by looking at that form and her father's purported signature on it that Plaintiff had sufficient information to cause the theft and conversion claims to accrue. Defendant does not argue that when Plaintiff filed this lawsuit on October 6, 2020, she did so too late after that starting point.

Nor does the Court find that Plaintiff pursued the form without sufficient diligence. She knew as early as June 2017 of the two options for obtaining the form. The first option was to request it from the estate's executor, but Defendant was serving in that role. The other option was

to obtain a court order, presumably meaning from the probate court. While she may not have asked the court for it, that does not mean she was being inactive. She was pursuing Defendant's replacement as the estate's personal representative which was a reasonable and relevant course of action to take. All told, one year and three months passed before she obtained the change of beneficiary form. While Plaintiff could have acted more expeditiously, that does not mean her pace of investigation was *unreasonably* slow.

In any event, Plaintiff had no reason to suspect forgery until she actually saw the form. Measuring from that point, the lawsuit was timely filed.

## III.    No Wrongful Deprivation of Policy Benefit

Having found Plaintiff's civil theft and conversion claims not barred by operation of the statute of limitations, the Court proceeds to consider whether Plaintiff proves her theft and conversion claims. Both causes of action require Plaintiff to establish that Defendant took or interfered with her property (consisting of the life insurance policy benefit). Plaintiff alleges wrongful, unauthorized action in the form of Defendant's forgery of Mr. Miller's signature on the change of beneficiary form.

The parties dispute whether Defendant wrote Mr. Miller's signature on the form. To be clear, I find that Plaintiff failed to prove by a preponderance of the evidence that Defendant forged Mr. Miller's signature. At best, Plaintiff submitted evidence that Mr. Miller may not have originally signed the form, but there was no direct or circumstantial evidence (other than her mere possession of the form prior to giving it to Mr. Miller) that Defendant signed it, and she denied that she did. However, regardless of who originally signed the form, there is a legal significance of Mr. Miller's act of affixing a pen to the form's signature block as shown in the photographs. If Mr. Miller had written the original signature, then the act captured by the photographs only

confirms his intention to effectuate the beneficiary change. If Mr. Miller did not write the original signature, then the photographs show either an act of signing in his own right or alternatively his adoption or ratification of the existing signature as his own.[1]

The purpose of a signature is to authenticate a writing, *Colorado v. Grant*, 30 P.3d 667, 673 (Colo. App. 2000) (citing § 134 of the Second Restatement of Contracts), the writing in this case being the beneficiary change request. In other words, a signature is how a person signals his or her acknowledgment or ratification of the written document. *Id*. A "signature," in turn, "may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer." *Id*. The photographs record Mr. Miller in the act of making a mark (in the form of tracing over or touching up the already existing signature) for the purpose of indicating his acceptance of the form. What the photographs show Mr. Miller doing, in other words, is "signing" the form.

Not only do the photographs capture Mr. Miller in the act of ratifying the form, but the signature on it as well. In the contract context, *Black's Law Dictionary* (11th ed. 2019) defines "ratification" as "[a] person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent." A person ratifies a contract if he knowingly accepts and approves of it with full knowledge of all material facts. *Liberty Mortg. Corp. v. Fiscus*, 379 P.3d 278, 283 (Colo. 2016) (citing *Colo. Mgmt. Corp. v. Am. Founders Life Ins. Co. of Denver*, 359

---

[1] The Court disagrees with Plaintiff that a signature-by-adoption finding creates any implication about Defendant's credibility. The Court makes no finding of who wrote the original signature, whether it was Mr. Miller, himself, or someone else. There is no need to do so because it is not the dispositive point of inquiry. For the same reason, there is no need for the Court to weigh the expert witnesses' opinions. Neither has an effect on the outcome of the case. The only material question is the legal effect of what the photographs show. Furthermore, the Court's verdict does not rely on the credibility of Defendant, as the uncontested photographic evidence is sufficient to find for her.

P.2d 665 (1961) and *Film Enters., Inc. v. Selected Pictures, Inc.*, 335 P.2d 260 (1959)). *See also Siener v. Zeff*, 194 P.3d 467, 471-73 (Colo. App. 2008). Whether Defendant meets the elements of ratification as a formal claim or theory of relief, the Court need not decide. Instead, the Court mentions the principle to illustrate how in a general sense one person can accept another's action as his own. Similarly, a person can acquiesce to and adopt as her own the signature that another made on her behalf. *In re Stitzer's Estate*, 68 P.2d 561 (Colo. 1937). In this way, Mr. Miller *authorized* the signature on the form (even if, as Plaintiff maintains, he did not write the original signature himself).

The legal concept of an adopted signature has a long history in American jurisprudence. "If competent circumstantial evidence tending to prove an adoption and ratification of a forged signature by one who knew all the material facts has been submitted to a jury under proper instructions, their verdict finding that the adoption and ratification were proved will not be set aside . . . ." *President, etc., of Greenfield Bank v. Crafts*, 86 Mass. 447, 447 (1862). Nearly 150 years ago, the Colorado Supreme Court held thus:

> Whether plaintiff actually signed, or previously directed another to sign, his name to the instrument, may be a matter of no importance. . . . If he duly acknowledged the instrument, and authorized its delivery, he thereby recognized and adopted the signature and seal, making them his own for the purposes of the conveyance.

*Chivington v. Colorado Springs Co.*, 9 Colo. 597, 604, 14 P. 212, 214 (Colo. 1887)

Viewed from another perspective, Plaintiff does not establish the occurrence of a forgery. Plaintiff's theft claims are premised on the allegation that Defendant wrote Mr. Miller's signature on the change of beneficiary form and through that act, caused wrongful deprivation and interference with her interest in the life insurance policy. Plaintiff's argument assumes that the simple act of signing someone's signature is a wrongful act, but she does not go further to explain whether the legal definition of "forgery" is met on these facts. *Black's Law Dictionary* (11th ed.

2019) defines "forgery" as "[t]he act of fraudulently making a false document . . . to be used as if genuine" with the intent to deceive. Likewise, common law defines it as "the false making, with the intent to defraud, of a document which is not what it purports to be." *U.S. v. Hunt*, 456 F.3d 1255, 1260 (10th Cir. 2006). Not only was there no evidence whatsoever that Mr. Miller believed Defendant had signed the form or that he was surprised or displeased that the form already was signed when it was presented to him, but the photographs show that Mr. Miller affirmatively either made marks to indicate his own signing of the form or alternatively to authorize the signature that already was there. Either way, when the form was presented to Jackson National Life Insurance Co., the form did not bear a signature made by someone else that falsely purported to be Mr. Miller's. To the contrary, when the insurer received the form, the signature on it accurately conveyed Mr. Miller's intention to make the requested beneficiary change.

Mr. Miller's act of affixing his pen to the form's signature line and of retracing or touching up the signature that already existed there (regardless of whether he was its original author) demonstrated his intent to make Defendant the full beneficiary of the insurance policy. Mr. Miller's intention to do so is consistent with the evidentiary record. The evidence shows that Mr. Miller both sought to provide for family but also had a volatile relationship with them, including with his daughter, the Plaintiff. Plaintiff herself conceded that her father would threaten disinheritance, although she regarded those threats as empty. Indeed, Mr. Miller did not fully disinherit Plaintiff; he in fact did provide for her in his will and the other life insurance policy. By time of the beneficiary change, Mr. Miller and Defendant had been in a long-term relationship (albeit one with its own difficulties). Their finances were interconnected, and Mr. Miller already had made Defendant beneficiary to and executor of other aspects of his estate. Indeed, Defendant initially was half beneficiary of the disputed insurance policy. Mr. Miller changed her to the full

beneficiary after he had become angry with Plaintiff. It also coincided with Mr. Miller learning that full beneficiary status would convey an additional spousal benefit to Defendant. The record contains recorded telephone calls from Mr. Miller to the insurance company in which he, himself, requested the change and instructed the insurance company to send the form to Defendant to fill out. Mr. Miller also requested a copy of the form be sent to him, which the record shows he received. Lastly, there are the photographs themselves which document the moment when Mr. Miller affixed the pen to the form's signature block. There is no evidence that suggests any undue influence or other irregularity on that day that raise doubts about the circumstances. Nor is there any dispute over the photographs themselves.

Because the form that Jackson National Life Insurance Co. received accurately reflected Mr. Miller's intention, the resulting change of beneficiary status whereby Plaintiff lost her beneficiary status was not the result of a wrongful action by Defendant. The evidence does not show that Defendant wrongfully deprived or otherwise interfered with Plaintiff's ability to recover from the policy. Consequently, Plaintiff proves neither her civil theft nor conversion claims.

**IV.     No Waiver**

Plaintiff argues that the Court may not consider the issue of whether Mr. Miller adopted, ratified, or otherwise authorized the signature on the form. Defendant did not plead any such theory as a defense in her Answer. ECF 64. Nor was "signature by adoption" tried before the Court, she contends. Plaintiff seeks to limit the Court to answering only the question of whether it was Defendant or Mr. Miller who wrote the original signature on the form. Plaintiff points out that Defendant "has maintained throughout the course of this litigation that it was Miller, and Miller alone, who executed the Change of Beneficiary Form" and that Defendant's testimony has been "that she witnessed Miller do so." ECF 77 at 2-3.

The Court does not find the "signature by adoption" to be a defense that Defendant waived because she did not plead it in her Answer. In the context of this case, ratification or adoption is not a formal cause of action or affirmative defense but rather a way to discuss what constitutes a "signature" in the legal sense. In other words, it asks what Mr. Miller was required to do to inform Jackson National Life Insurance Co. of his intent to make Defendant the full beneficiary.

Furthermore, an affirmative defense is one that seeks to avoid liability even when a plaintiff has established all the elements of her claim. Here, whether Mr. Miller originally signed the form or else re-signed it (regardless of who originally placed a signature there) and thereby adopted it, goes to the issue of whether Plaintiff has met her burden *at all* on her claims. *See LaFont v. Decker-Angel*, 182 F.3d 932 (10th Cir. 1999) (drawing a "distinction between the introduction of evidence in support of an avoidance or affirmative defense and the introduction of evidence to refute the plaintiff's allegations in the complaint").

Nor was it a matter tried without the parties' consent or notice of the possibility. Instead, it is an issue that naturally arose from the parties' arguments and the evidence. In this decision, the Court does not rely on a single fact outside the trial record, but rather decides the legal consequences of the facts that were tried. Specifically, the photographs were a central feature of the trial. Those photographs, and what they show, were discussed at length and in a variety of contexts, including with the expert witnesses. Indeed, it was the Court who raised the issue at the close of the trial and asked the parties for briefing on the subject. The Court asked the parties "to consider the application of the concept of an adopted signature," a subject which the Court regarded as "self-evident," and to address it in their proposed findings of fact and conclusions of law. ECF 70 at 214-15. The parties may not have consciously litigated that particular *legal* theory, but it nonetheless was the central point at trial *factually*: What was Mr. Miller doing in those

photographs? To exclude the photographs from consideration would needlessly restrict the Court's ability to render a full and complete decision on the merits. Albeit in a different context—over whether Defendant might assert incompetence as an affirmative defense—Plaintiff, herself, expressed preference for a decision on the substance of a dispute rather than on a procedural issue. ECF 69 at 17. That the parties failed to grasp the legal consequences of Mr. Miller's act in re-tracing or adopting a signature is, in the end, not dispositive.

**V.     No Frivolous Filings**

Neither side took a position that was frivolous. Evidence provided support for each of their respective arguments.

## CONCLUSIONS OF LAW

I.      Title 28 U.S.C. § 1332 gives this Court jurisdiction over the subject matter of this lawsuit because the citizenship of the parties is diverse (Plaintiff is a citizen of Texas and Defendant is a citizen of Colorado) and the amount in controversy exceeds $75,000.

II.     Venue is proper under 28 U.S.C. § 1391 because Defendant resides in Colorado, is a citizen of Colorado, and the disputed actions took place in Colorado.

III.    Because this Court has diversity jurisdiction and because Colorado is the forum state, Colorado substantive law governs the parties' dispute.

IV.     Plaintiff filed this lawsuit and raised her civil theft and conversion claims within the two-year statute of limitations.

V.      Plaintiff does not prove by a preponderance of the evidence that Defendant committed all the elements of civil theft.

VI.     Plaintiff does not prove by a preponderance of the evidence that Defendant committed all the elements of conversion.

## **CONCLUSION**

The Clerk of Court shall enter Final Judgment in Defendant's favor on all claims for relief and close this civil action.

SO ORDERED.

Dated at Denver, Colorado, this 27th day of August, 2021.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge